O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| WBS, INC., a California Corporation, | ) ) ) | Case No. CV 15-07251 DDP (JCx) |
| Plaintiff, | ) ) | |
| v. | ) ) | **ORDER RE: MOTIONS FOR SUMMARY JUDGMENT** |
| JUAN CROUCIER,et al | ) ) | |
| Defendants. | ) ) | |
| _____ | ) ) | [Dkts. 159, 119, 115, 107] |

Presently before the court are three separate motions for summary judgment: one filed by Defendant Juan Croucier, another filed by Defendants Rob Hoffman and 1 Model Management, LLC (collectively, "Hoffman"), and a third filed by Plaintiff.  Having considered the submissions of the parties, the court grants Defendants' motions, denies Plaintiff's motion, and adopts the following Order.[1]

_____

[1] It has not escaped the court's attention that Plaintiff's submissions undisputedly violate several of this district's local rules.  In the interest of resolving matters on the merits, the court denies Defendant Croucier's request to strike Plaintiff's Motion.  (Dkt. 159.)  Plaintiff's "Response" to Croucier's request, however, is not well-taken.  Plaintiff's attempt to impugn Croucier's motives in making the request does nothing to excuse or
(continued...)

# I.   Background

In 1985, the five founding members of the heavy metal band RATT formed a California partnership ("the RATT Partnership" or "Partnership"). (Declaration of Juan Croucier in Support of Motion, Ex. A.) The members of the RATT Partnership were Robbinson Lantz Crosby, Stephen Pearcy, Robert Blotzer, Warren DeMartini, and Defendant Juan Croucier. (<u>Id.</u>) A written agreement formalizing the Partnership (the "Partnership Agreement") provided that "each member . . . owned an equal 20% share in the partnership, including in [several] RATT trademarks." (<u>Id.</u> ¶ 4; Ex. A at 5).[2] Under the Partnership Agreement, no partner could transfer his interest without the unanimous written consent of all partners. (<u>Id.</u>, Ex. A at 14.) Partners could voluntarily withdraw from the RATT Partnership by giving the other partners three months written notice of the withdrawing partner's intent to withdraw, or could be involuntarily expelled from the RATT Partnership with the unanimous consent of the other partners. (<u>Id.</u>, Ex. A at 16.)

The band went on hiatus in 1992, by which time one of the five members of the RATT Partnership, Crosby, had been expelled in accordance with the Partnership Agreement. (Croucier Decl. ¶ 6.) In 1992, Pearcy hand-wrote a document referring to his "departure

---

[1](...continued)
justify Plaintiff's violations. Plaintiff's counsel is cautioned that the court expects full compliance with all procedural rules, and that further violations may result in sanctions.

[2] The word and design marks at issue were registered in 1985, and bear registration numbers 1383345, 1383344, 1368246, and 136824.

1  from RATT" and stating that he was "leaving the band."[3]  (Croucier

2  Decl., Ex. B.)  That same year, DeMartini's representative informed

3  the other members of the band that DeMartini was no longer a member

4  "of the recording and performing group professionally known as

5  RATT."  (Croucier Decl., Ex. C.)

6      In January 1997, Blotzer and Pearcy purportedly sent Croucier

7  a "letter of expulsion" expelling him from the RATT Partnership.

8  (Supplemental Declaration of Drew Sherman, Ex. G at 18; Ex. X at

9  16.)  Later that year, Pearcy, Blotzer, and DeMartini executed a

10 "Bill of Sale and Agreement" representing that they were the

11 members of the RATT Partnership and conveying all rights in the

12 RATT trademarks to the newly formed WBS, Inc. ("WBS" or

13 "Plaintiff") in exchange for shares in WBS.  (Counterclaim ¶ 17;

14 Croucier Decl. ¶ 8; Request for Judicial Notice, Ex. 5.)  Croucier

15 was not a party to this transaction, nor did he tour with the RATT

16 band in 1997.  (Declaration of Drew Sherman in Support of

17 Plaintiff's Motion, Ex. G at 160.)  WBS recorded the assignment of

18 the trademarks with the United States Patent and Trademark Office

19 seven years later, in 2004.  (RJN, Ex. 5.)  Various iterations of

20 RATT toured, without Croucier, between 1992 and 2012.  Croucier

21 rejoined the band from 2012 to 2014.

22     In 2013, after discussions with Blotzer, Croucier, DeMartini,

23 and Pearcy, Defendant Hoffman began working as RATT's band manager.

24 (Declaration of Rob Hoffman ¶ 3.)  Hoffman followed the day-to-day

25 direction of Blotzer and DeMartini who, by that time, were the only

26 _____

27     [3] In 1995, Pearcy wrote another letter disclaiming authorship
   of the 1992 writing, confirming that he had withdrawn from the
28 band, and maintaining that the RATT Partnership no longer existed.
   (Supp. Sherman Decl., Ex. X at 10.)

1  two shareholders of WBS.  (Id. ¶¶ 2-3,5.)  At some point, Hoffman
2  was given sole administrator rights to RATT's Facebook and Twitter
3  accounts.  (Hoffman Decl. ¶ 11.)

4      In 2014, Pearcy, Croucier, and Blotzer each formed or
5  performed with their own separate bands.  (Croucier Decl. ¶ 10.)
6  Blotzer formed a band called "Bobby Blotzer's Ratt Experience," but
7  then changed his band's name to RATT.  (Id.)  In August 2015,
8  Croucier's band announced itself as "RATT's Juan Croucier."
9  (Supplemental Declaration of Drew Sherman, Ex. G at 35.)  Croucier
10  began using the RATT marks on advertisements and merchandise, and
11  continued to refer to himself as "The Other Voice of RATT," as he
12  had done since as early as 2007.  (Id. at 38, 56.)  In August 2015,
13  counsel for Blotzer made several demands that Croucier stop using
14  the RATT marks.  (Suppl. Sherman Decl., Ex. B.)  "RATT's Juan
15  Croucier" has played approximately twelve shows since August 15,
16  2015, and Croucier admittedly continues to use the marks. (Id. at
17  Ex. at G36.)  On September 10, 2015, Croucier sent a letter to
18  DeMartini confirming that Croucier was "currently a member of Ratt
19  and the band has not played any shows" since 2012.  (Croucier
20  Decl., Ex. 3.)  That same day, DeMartini confirmed that Croucier's
21  statement was accurate.  (Id.)

22      On September 4, 2015, counsel for Blotzer demanded that
23  Hoffman turn over all social media logins and passwords "that are
24  owned by WBS, Inc. or use any of WBS, Inc's intellectual property."
25  (Hoffman Decl. ¶ 12.)  That same day, however, DeMartini instructed
26  Hoffman not to take any action.  (Hoffman Decl., Ex. B.)  Hoffman
27  informed Blotzer's counsel of the dispute between the WBS

28

4

1 shareholders and expressed a desire to remain neutral until the
2 dispute was resolved.[4]  (<u>Id.</u> ¶ 14.)

3     On September 15, 2015, WBS filed the instant action against
4 Croucier and Hoffman, alleging causes of action against Croucier
5 for trademark infringement and dilution, unfair competition, and
6 interference with economic relations related to Croucier's
7 advertising and performances with "RATT's Juan Croucier," as well
8 as tortious interference and conversion claims against Hoffman.
9 (Dkt. 1).  DeMartini has since filed a shareholder derivative suit
10 against Blotzer on behalf of WBS.  (Croucier Decl. ¶ 10.)

11     WBS and Croucier now move for summary judgment on WBS'
12 trademark-related claims against Croucier.  Hoffman also moves for
13 summary judgment with respect to the claims against him.

14 **II.  Legal Standard**

15     Summary judgment is appropriate where the pleadings,
16 depositions, answers to interrogatories, and admissions on file,
17 together with the affidavits, if any, show "that there is no
18 genuine dispute as to any material fact and the movant is entitled
19 to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A party
20 seeking summary judgment bears the initial burden of informing the
21 court of the basis for its motion and of identifying those portions
22 of the pleadings and discovery responses that demonstrate the
23 absence of a genuine issue of material fact.  <u>See</u> <u>Celotex Corp. v.</u>
24 <u>Catrett</u>, 477 U.S. 317, 323 (1986).  All reasonable inferences from
25 the evidence must be drawn in favor of the nonmoving party. <u>See</u>
26 <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 242 (1986).  If the

27 _____

28     [4] Blotzer's counsel represents WBS in the instant matter.

5

1  moving party does not bear the burden of proof at trial, it is

2  entitled to summary judgment if it can demonstrate that "there is

3  an absence of evidence to support the nonmoving party's case."

4  Celotex, 477 U.S. at 323.

5      Once the moving party meets its burden, the burden shifts to

6  the nonmoving party opposing the motion, who must "set forth

7  specific facts showing that there is a genuine issue for trial."

8  Anderson, 477 U.S. at 256.  Summary judgment is warranted if a

9  party "fails to make a showing sufficient to establish the

10 existence of an element essential to that party's case, and on

11 which that party will bear the burden of proof at trial." Celotex,

12 477 U.S. at 322.  A genuine issue exists if "the evidence is such

13 that a reasonable jury could return a verdict for the nonmoving

14 party," and material facts are those "that might affect the outcome

15 of the suit under the governing law." Anderson, 477 U.S. at 248.

16 There is no genuine issue of fact "[w]here the record taken as a

17 whole could not lead a rational trier of fact to find for the

18 nonmoving party." Matsushita Elec. Indus. Co. v. Zenith Radio

19 Corp., 475 U.S. 574, 587 (1986).

20     It is not the court's task "to scour the record in search of a

21 genuine issue of triable fact." Keenan v. Allan, 91 F.3d 1275,

22 1278 (9th Cir.1996).  Counsel has an obligation to lay out their

23 support clearly.  Carmen v. San Francisco Sch. Dist., 237 F.3d

24 1026, 1031 (9th Cir.2001).  The court "need not examine the entire

25 file for evidence establishing a genuine issue of fact, where the

26 evidence is not set forth in the opposition papers with adequate

27 references so that it could conveniently be found." Id.

28 **III. Discussion**

6

1    A.  Whether WBS Owns the Trademarks

2        A threshold issue in this matter is whether WBS has an

3    ownership interest in the RATT trademarks.  See Rearden LLC v.

4    Rearden Commerce, Inc., 683 F.3d 1190, 1202-3 (9th Cir. 2012)

5    (listing elements of a trademark claim).  It is undisputed that, at

6    some point, the RATT Partnership owned the RATT marks.  Croucier

7    maintains that he never left the RATT Partnership, that any

8    purported assignment of the marks to WBS was invalid, and that the

9    Partnership owns the marks to this day.

10       WBS argues that because it registered an assignment of the

11   RATT marks from the Partnership to WBS with the Patent and

12   Trademark Office in 2004, its ownership of the marks is

13   incontestable.  Registration of a trademark does give rise to a

14   presumption of ownership, subject to rebuttal by a preponderance of

15   the evidence.  Sengoku Works Ltd. v. RIMC Int'l, Ltd., 96 F.3d

16   1217, 1219 (9th Cir. 1996); 15 U.S.C. 1115(a).  However, a showing

17   that the registrant "had not established valid ownership rights in

18   the mark at the time of registration" can serve to rebut the

19   presumption of ownership.  Id. at 1220.  The Ninth Circuit has also

20   held that because an invalid assignment of a trademark conveys no

21   rights, the registration of such an assignment does not grant any

22   rights in the trademark.  Mr. Donut of America v. Mr. Donut, Inc.,

23   418 F.2d 838, 842 (9th Cir. 1969).[5]

24

25

26       [5] Plaintiff's citation to 15 U.S.C. § 1060(a)(3) is inapt.
27   Although the statute provides that recordation of an assignment is
     prima facie evidence of an assignment's execution, the issue here
28   is not whether the assignment to WBS was executed, but rather
     whether that assignment was valid.

1   Even assuming that Plaintiff has made a prima facie showing of

2   ownership of the RATT marks, there is no triable issue with respect

3   to the question whether the assignment from the Partnership to WBS

4   was invalid.  Plaintiff asserts that, at the time of the assignment

5   in 1997, Pearcy, Blotzer, and DeMartini were the only remaining

6   members of the RATT Partnership, and therefore had the authority to

7   convey the rights in the marks to WBS without Croucier's consent.

8   Croucier contends first that there "is an open factual question as

9   to whether Mr. Pearcy and Mr. DeMartini withdrew from the band or

10  the Partnership" prior to 1997.  Croucier points to two separate

11  documents supposedly drafted in 1992.  The first document,

12  apparently written by Pearcy on the back of a napkin in February

13  1992, is addressed to "Allen Kouvac," who appears to have been the

14  manager of RATT at the time.  Although difficult to discern, the

15  writing appears to refer to Pearcy's "departure from RATT . . .

16  [a]nd that I'm leaving the band." (Croucier Decl., Ex. B.)

17  Croucier posits that because Pearcy stated that he was leaving the

18  band and referred to his "departure from RATT" separately, he must

19  have meant that he was leaving the RATT Partnership.  Further,

20  although Pearcy later, in 1995, denied authoring any document

21  addressed to "Allen Kovak," he also took the position that, as of

22  1995, "there is no RATT a partnership," suggesting that he may, at

23  some point, have withdrawn from the partnership.  (Supp. Sherman

24  Decl., Ex. X at 10.)

25      Although a reasonable trier of fact could not conclude, on

26  this record, that the napkin alone sufficed to signify or inform

27  the other members of the RATT Partnership of Pearcy's voluntary

28  departure from the Partnership, it does, in conjunction with his

1   1995 disavowal of the continued existence of the Partnership,
2   create a triable issue of fact as to his partnership status at the
3   time of the 1997 assignment to WBS.

4       The second document to which Croucier cites presents a
5   question as to whether DeMartini withdrew from the RATT Partnership
6   prior to the 1997 assignment to WBS.  On June 1, a Linda Rein,
7   whose identity is not entirely clear to the court, addressed a
8   letter to "The RATT Partnership" on behalf of DeMartini.  (Croucier
9   Decl., Ex. C.)  The letter represented itself as "formal notice
10  that Warren DeMartini is no longer a member of the recording and
11  performing group professionally known as 'RATT', effective as of
12  the date" of the letter.  (Id.)  The letter was copied to
13  DeMartini, Croucier, Blotzer, and others, but not to Pearcy.  (Id.)
14  The letter is sufficiently ambiguous to, as Croucier acknowledges,
15  create an open question regarding DeMartini's withdrawal.  The
16  letter refers only to DeMartini's withdrawal from the band RATT,
17  with no mention of the RATT Partnership, and does not strictly
18  comply with the requirements of the Partnership Agreement, as it
19  does not provide three months advance notice and, arguably, to the
20  extent it was not copied to Pearcy, did not inform all of the other
21  partners of DeMartini's intent.  The letter was, however, addressed
22  to the RATT Partnership.  Although the bulk of the evidence appears
23  to suggest that DeMartini did not intend to withdraw from the
24  Partnership, a trier of fact might conceivably conclude otherwise.

25      These lingering questions about Pearcy and DeMartini's
26  continued membership in the Partnership as of 1997 would, on their
27  own, preclude a grant of summary judgment in either Croucier or
28  WBS' favor.  The question of Croucier's membership in the

                                    9

1    Partnership, however, is more fundamental.  There is no dispute

2    that Croucier remained a partner through the end of 1996.

3    Plaintiff contends that Croucier was expelled from the Partnership

4    in 1997, and that Blotzer, DeMartini and Pearcy therefore did not

5    need Croucier's consent to assign the RATT marks from the

6    Partnership to WBS later that same year.  As proof of its

7    contention, WBS cites to a letter to Croucier dated January 20,

8    1997 stating, "The undersigned, by their unanimous vote and

9    consent, in accordance with . . . the Partnership Agreement . . .,

10   herewith advise you that you are expelled from the partnership,

11   Ratt."  (Declaration of Stephen Pearcy, Ex. 1.)  The letter is

12   purportedly signed by Blotzer and Pearcy.  (Id.)

13        This "letter of expulsion" is insufficient to establish that

14   Croucier was expelled from the Partnership for several reasons.

15   First, it is undisputed that, under the terms of the Partnership

16   Agreement, a partner could be involuntarily expelled from the

17   Partnership only with the unanimous consent of the remaining

18   partners.  The 1997 "Bill of Sale and Agreement" conveying all

19   rights in the RATT trademarks to WBS represented that Pearcy,

20   Blotzer, and DeMartini were the members of the RATT Partnership,

21   and WBS has taken the position in this litigation that DeMartini

22   never withdrew from the Partnership.  (WBS Opposition to Croucier

23   Motion at 9).  The letter of expulsion, however, refers to the

24   "unanimous vote and consent" of only two partners, Blotzer and

25   Pearcy.  If, as WBS maintains, DeMartini never left the

26   Partnership, his consent would have been required to expel

27

28

1  Croucier.[6]  Notwithstanding the Partnership's subsequent

2  representation at the time of the assignment that its members were

3  Pearcy, Blotzer, and DeMartini, there is no evidence that DeMartini

4  ever consented to Croucier's expulsion, let alone that he did so in

5  January 1997.

6      Second, Pearcy, one of two supposed signatories to the letter

7  of expulsion, has stated, under penalty of perjury, that he never

8  discussed Croucier's expulsion from the RATT Partnership with

9  Blotzer, never understood Croucier to have been expelled, and has

10  no recollection of seeing the 1997 expulsion letter prior to this

11  litigation.  (Pearcy Decl. ¶¶ 102.)  Pearcy's declaration states

12  that the letter "is not the product of any agreement I reached with

13  Robert Blotzer or anyone else."[7]  (Id. ¶ 2.)  Although, as

14  discussed above, Pearcy's understanding is somewhat difficult to

15  reconcile with the 1997 Bill of Sale and Agreement, which

16  represents that Pearcy, DeMartini, and Blotzer were "the Partners"

17

18

19  _____

20      [6]  At oral argument, Plaintiff asserted for the first time
   that although the Partnership Agreement required the unanimous
21  consent of all the partners to involuntarily expel another partner,
   it did not require that the writing notifying an expelled partner
22  of his expulsion be signed by all of the expelling partners.  Even
   assuming that interpretation to be correct, there is no evidence
23  that DeMartini ever consented to Croucier's expulsion.  The
   expulsion letter itself only refers to the unanimous vote and
24  consent of "the undersigned," i.e. Blotzer and Pearcy.  There is no
   suggestion in the letter itself that DeMartini ever opined on
25  Croucier's expulsion, and no other evidence in the record to
   suggest as much.

26      [7]  At argument, Plaintiff appeared to suggest that Pearcy's
27  declaration is not credible.  Plaintiff has not, however, filed any
   evidentiary objection to Pearcy's declaration or submitted any
28  evidence, other than the letter itself, that conflicts with or
   contradicts Pearcy's assertions.

1   of WBS, on this record, no reasonable trier of fact could conclude

2   that Croucier was ever expelled from the RATT Partnership.[8]

3       The evidence is undisputed that Croucier was a founding

4   partner of the RATT Partnership.  No reasonable factfinder could

5   conclude that Croucier was ever expelled from the Partnership.  It

6   is undisputed that no partner in the RATT Partnership could

7   transfer or assign any part of his interest in the RATT Partnership

8   without the unanimous consent of the other partners.  Croucier has

9   never consented to the assignment of the RATT marks to WBS or to

10  anyone else.  Accordingly, there is no triable issue with respect

11  to the validity of the assignment of the RATT marks to WBS.

12  Because the assignment was invalid, WBS cannot make the threshold

13  showing that it has an ownership interest in the marks, and its

14  trademark claims fail.[9]  Summary judgment is therefore warranted in

15  favor of Croucier and against WBS.[10]

16      B.   Claims against Hoffman

17         1.   Conversion

18      Under California law, a conversion claim requires (1)

19  ownership or right to possession of property, (2) wrongful

20  disposition of that property, and (3) damages.  G.S. Rasmussen &

21

22      [8] Indeed, Blotzer himself does not appear to share WBS'
    position that Croucier was expelled from the Partnership.  Although

23  Plaintiff cites to one of Blotzer's declarations to support the
    contention that Croucier "was formally terminated from the

24  Partnership," Blotzer stated that Croucier "on his own will and
    volition[] withdrew from the Band and the RATT partnership."

25  (Supp. Sherman Decl., Ex. O at 2.)

26      [9] WBS' unfair competition claim is predicated upon its
    trademark claims, and therefore also fails.

27      [10] Having concluded that there is no triable issue of fact

28  regarding an essential element of Plaintiff's claim, the court need
    not address the parties' arguments regarding Croucier's defenses.

1   <u>Assoc., Inc. v. Kalitta Flying Serv., Inc.</u>, 958 F.2d 896, 906 (9th

2   Cir. 1992). "In order to establish a conversion the plaintiff must

3   show an intention or purpose to convert the goods and to exercise

4   ownership over them, or to prevent the owner from taking possession

5   of his property.  Thus, a necessary element of the tort is an

6   intent to exercise ownership over property which belongs to

7   another." <u>Collin v. Am. Empire Ins. Co.</u>, 21 Cal. App. 4th 787, 405

8   (1994).

9       It is undisputed that WBS granted Hoffman sole administrator

10  access to the RATT band's social media accounts.  On September 4,

11  2015, counsel for Blotzer demanded that Hoffman turn over all

12  logins and passwords for "all social media accounts . . . that are

13  owned by WBS, Inc. or use any of WBS, Inc's intellectual property,

14  including, but not limited to, trademarks and copyrights."[11]

15  (Hoffman Decl., Ex. A.)  That same day, DeMartini contacted

16  Hoffman, informing him that Blotzer's "unilateral actions do not

17  change any of the existing positions at WBS" and instructing

18  Hoffman not to take any action.  (<u>Id.</u>, Ex. B.)  Hoffman informed

19  Blotzer's counsel of the dispute between the shareholders and

20  expressed a desire to remain neutral until the dispute was

21  resolved.  (<u>Id.</u> ¶ 14.)  Plaintiff then filed this suit against

22  Hoffman.  Approximately two weeks later, DeMartini filed suit

23  against Blotzer regarding control of WBS.  (<u>Id.</u> ¶ 19.)

24      Even assuming that WBS owned the social media accounts to

25  which it demanded access, no reasonable trier of fact could

26  conclude that Hoffman's refusal to turn over the logins and

27

28      [11] As discussed above, the evidence establishes that the
    assignment of the RATT marks to WBS was invalid.

13

1  passwords was wrongful.  WBS' governing "Code of Conduct and

2  Operation" provides that termination of "management, or other

3  affiliates connected with the Band," or any threat of litigation on

4  WBS' behalf, shall require a majority vote of WBS' members.

5  (Hoffman RJN, Ex. 2 at 94 of 100.)  There is no dispute that, by

6  September 2015, DeMartini and Blotzer were WBS' only shareholders,

7  and that each held a 50 percent interest.  It is also undisputed

8  that Hoffman had previously been granted exclusive authority to

9  manage the social media accounts.  DeMartini's correspondence with

10  Hoffman, however, clearly indicates that WBS' threats to sue

11  Hoffman, since carried out, and efforts to terminate Hoffman as

12  manager of the social media accounts were made against DeMartini's

13  wishes and, therefore, without majority shareholder support and

14  contrary to WBS' Code of Conduct and Operation.  WBS has not

15  provided any evidence suggesting that Blotzer's counsel's demand to

16  Hoffman complied with WBS' own governing document.[12]  Accordingly,

17  no trier of fact could find Hoffman's neutrality to be a wrongful

18  taking of WBS property.  Hoffman is therefore entitled to summary

19  judgment on Plaintiff's claim for conversion.

20          2.    Intentional Interference with Prospective Economic

21               Advantage

22      An intentional interference with prospective economic

23  relations claim requires (1) an economic relationship between

24  plaintiff and a third party with the probability of future economic

25  benefit to the plaintiff, (2) defendant's knowledge of that

26  relationship, (3) defendant's intentional, independently wrongful

27

28      [12] Indeed, Plaintiff's Opposition to Hoffman's Motion does not make a single citation to the record.

1   act to disrupt the relationship, (4) actual disruption, and (5)

2   economic harm to the plaintiff.  <u>Marsh v. Anesthesia Serv. Med.</u>

3   <u>Group. Inc.</u>, 200 Cal.App.4th 480, 504 (2011) (citing <u>Korea Supply</u>

4   <u>v. Lockheed Martin Corp.</u>, 29 Cal.4th 1134, 1153 (2003)).  As noted

5   above, Plaintiff's opposition to Hoffman's motion cites no evidence

6   whatsoever, let alone any evidence that the elements of its

7   intentional interference claim are satisfied here.  (See note 7,

8   supra.)

9        Even assuming, as WBS asserts, that there is a triable issue

10  regarding WBS' economic relationship with specific third parties,

11  namely RATT's (unnamed) social media followers, there is no

12  evidence that Hoffman's refusal to turn over social media passwords

13  caused any economic harm to WBS.  WBS simply assumes, without any

14  evidentiary support or citation to the record, that had Hoffman

15  turned over the passwords to Blotzer's counsel, WBS would have more

16  actively communicated with followers over social media and

17  successfully translated those outreach efforts into some economic

18  gain.

19       Even taking that unfounded assumption as true, furthermore,

20  there is no evidence that Hoffman engaged in an "independently

21  wrongful act."  An act is independently wrongful "if it is

22  proscribed by some constitutional, statutory, regulatory, common

23  law, or other determinable legal standard."  <u>Korea Supply</u>, 29

24  Cal.4th at 1159.  Although Plaintiff has not articulated its theory

25  of Hoffman's independently wrongful act, it presumably refers to

26  Hoffman's alleged conversion of the social media accounts.  As

27  explained above, however, WBS' conversion claim is not viable.

28  Absent any other independently wrongful act, Hoffman cannot be

1  liable for intentional interference with prospective economic

2  relations.   Accordingly, summary judgment is granted in Hoffman's

3  favor.

4  **IV.   Conclusion**

5       For the reasons stated above, Plaintiff's Motion for Summary

6  Judgment is DENIED.   Defendants' Motions for Summary Judgment are

7  GRANTED.

8

9  IT IS SO ORDERED.

10

11

12  Dated: November 8, 2016

                                    DEAN D. PREGERSON
13                                  United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28